**PESQUERA MARES AUSTRALES LTDA., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee,**

v.

**Coalition for Fair Atlantic Salmon Trade, Defendant–Appellee.**

No. 00–1427.

United States Court of Appeals, Federal Circuit.

Sept. 25, 2001.

. Michael T. Shor, Arnold & Porter, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Kevin T. Traskos.

Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee, United States. With him on the brief was David M. Cohen, Director. Of counsel on the brief were John D. McInerney, Acting Chief Counsel; Berniece A. Browne, Senior Counsel; and Robert J. Heilferty, Senior Attorney, Office of Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.

Michael J. Coursey, Collier Shannon Scott, PLLC, of Washington, DC, for defendant-appellee, Coalition for Fair Atlantic Salmon Trade. With him on the brief

were David C. Smith, Jr., and John M. Herrmann.

Before MICHEL, SCHALL, and DYK, Circuit Judges.

DYK, Circuit Judge.

This case presents the question whether the Department of Commerce's ("Commerce") interpretation of the phrase "identical in physical characteristics" by reference to commercial practice is consistent with the antidumping statute (codified in pertinent part at 19 U.S.C. § 1677(16)(A)) and, if so, whether it is reasonable. We conclude that Commerce's use of commercial practice to inform its interpretation of the phrase is not foreclosed by the statute, nor has the appellant shown that such an approach is unreasonable. We accordingly defer—under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—to Commerce's interpretation of the phrase "identical in physical characteristics," 19 U.S.C. § 1677(16)(A). We further hold that substantial evidence supports Commerce's decision to compare sales to Japan of "super-premium" salmon to sales to the United States of "premium" grade salmon when calculating the antidumping margin for Pesquera Mares Australes, Ltda. ("Mares Australes"), and that Commerce's decision has been adequately explained. We accordingly affirm the decision of the Court of International Trade in *Pesquera Mares Australes, Ltda. v. United States*, No. 98–08–02680, 2000 WL 766520 (Ct. Int'l Trade June 5, 2000) (unpublished disposition).

## BACKGROUND

This particular case involves the determination of the dumping margin for imports of Atlantic fresh, farmed salmon from the Republic of Chile by Mares Australes.[1]

On July 2, 1997, Commerce, in response to a petition filed by appellee Coalition for Fair Atlantic Salmon Trade ("FAST") and its individual members, initiated an antidumping duty investigation to determine whether Chilean exporters of Atlantic fresh, farmed salmon were selling that subject merchandise in the United States at less than fair value. *Initiation of Antidumping Duty Investigation: Fresh Atlantic Salmon from Chile*, 62 Fed.Reg. 37,027 (July 10, 1997).

On August 26, 1997, Commerce determined that it could not individually examine all Chilean producers and exporters of Atlantic fresh salmon. As authorized by 19 U.S.C. § 1677f–1(c)(2), the agency accordingly limited its antidumping investigation to Mares Australes and four other leading Chilean salmon producers and exporters (collectively, "respondents"). *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Fresh Atlantic Salmon from Chile*, 63 Fed.Reg. 2,664, 2,664–5 (Jan. 16, 1998) ("Preliminary Results").

The purpose of an antidumping investigation is to determine whether dumping duties should be imposed on subject merchandise when it is imported into the United States. Under the antidumping statute, Commerce is required to impose antidumping duties on "subject merchandise"[2] that "is being, or is likely to be,

---

**1.** The antidumping statute, as amended by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) ("URAA"), governs this appeal. *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed.Cir.1995).

**2.** The antidumping statute defines "subject merchandise" in pertinent part as "the class or kind of merchandise that is within the scope of an [antidumping] investigation, a review, a suspension agreement, an order un-

sold in the United States at less than its fair value" to the detriment of a domestic industry. 19 U.S.C. § 1673.

Commerce determines those duties by first calculating the "dumping margin" for the subject merchandise, *i.e.,* the total amount by which the price charged for a corresponding foreign like product in the home market or third-country market (the "normal value") exceeds the price charged for the subject merchandise in the United States (the "United States price"). 19 U.S.C. § 1677(35)(A); *see also* 19 U.S.C. § 1673(2)(B).[3] In other words, to determine whether antidumping duties should be imposed, Commerce must make a "fair comparison" between the United States price charged for the subject merchandise (here, fresh Atlantic salmon) and the price charged for the corresponding foreign like product in the home market (the "normal value"). 19 U.S.C. § 1677b(a). To make this comparison Commerce must determine the normal value of the "foreign like product."

When (as here) no satisfactory exporting country price is available, the antidumping statute authorizes Commerce to base normal value on the sales price of the foreign like product in a third-country market, that is, "the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States...." 19 U.S.C. § 1677b(a)(1)(B)(ii). In this case, Commerce based the normal value of the foreign like product sold by Mares Australes and two other respondents on those companies' sales of Atlantic

fresh salmon to Japan, which Commerce determined was "the appropriate comparison market." Preliminary Results, 63 Fed.Reg. at 2,668.

In addition to determining the appropriate comparison market, Commerce must also identify the "foreign like product" that is to be compared to the subject merchandise exported to the United States. Section 1677(16) of the antidumping statute specifically defines "foreign like product," in turn, as:

[M]erchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The subject merchandise and other merchandise *which is identical in physical characteristics* with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the subject merchandise,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

der this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921." 19 U.S.C. § 1677(25).

3. The United States price is calculated by using one of two statutorily-prescribed methodologies—export price ("EP") or constructed export price ("CEP"). 19 U.S.C.

§ 1677a(a)-(b); *see also* 19 U.S.C. § 1677(35)(A). "[W]here a sale is made by a foreign producer or exporter to an affiliated purchaser in the United States, the statute provides for use of CEP as the United States price...." *Micron Tech., Inc. v. United States,* 243 F.3d 1301, 1303 (Fed.Cir.2001).

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16) (emphasis added). That definition is applicable to 19 U.S.C. § 1677b(a)(1)(B). *See SKF USA Inc., v. United States,* 263 F.3d 1369, 1381 (Fed. Cir.2001). In this case Commerce used the definition set forth in subsection (A) of § 1677(16) to define the "foreign like product." In other words, Commerce sought to identify salmon sold by Mares Australes to Japan that was "identical in physical characteristics" to salmon exported by that company to the United States. It is Commerce's interpretation of the phrase "identical in physical characteristics" that is at issue.

To determine Japanese "merchandise which is identical in physical characteristics," 19 U.S.C. § 1677(16)(A), to the subject merchandise sold in the United States, Commerce (with agreement of all parties) used three matching criteria based on the physical characteristics of the salmon: "form, grade, and weight band." Preliminary Results, 63 Fed.Reg. at 2,666. It is the second criterion—the "grade," or quality, of the salmon—that is relevant here.[4] All parties agree that there are no uniform international or national grading standards or requirements for fresh Atlantic salmon. But the Association of Chilean Salmon and Trout Exporters ("Association"), of which Mares Australes is a member, has promulgated certain minimum grading criteria that its members are required to adopt. The Association recognizes (and Mares Australes during the review period adopted) four grades for fresh Atlantic whole salmon. In descending order of quality, there are: (1) super-premium; (2) premium; (3) grade one; (4) industrial. During the review period, Mares Australes sold super-premium and premium grade salmon to Japan, but did not sell super-premium grade salmon to the United States. And Mares Australes was "the only respondent to sell both super-premium and premium grade salmon to Japan" during the review period. *Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon From Chile,* 63 Fed.Reg. 31,411, 31, 414 (June 9, 1998) ("Final Results").

Before Commerce's issuance of its Preliminary Results, Mares Australes argued that the super-premium salmon it sold to Japan could not be considered "identical in physical characteristics," 19 U.S.C. § 1677(16)(A), to the premium grade salmon it sold to the United States. As evidence of this distinction, the company stressed that Association promulgated higher grading standards for super-premium than premium salmon; that certain physical defects (such as external lacerations to the salmon) were present in premium but not super-premium salmon; that super-premium salmon enjoyed a darker, redder color than premium salmon; and that its customers in Japan, recognizing these physical and color distinctions, paid higher prices for premium-grade salmon. The color differences were particularly emphasized by Mares Australes.

In a January 8, 1998, memorandum to the parties, Commerce preliminarily accepted Mares Australes' argument that *bona fide* physical differences existed between super-premium and premium salmon, stating:

---

4. We understand "form" to refer here to the degree of processing of the salmon, namely, whether it is sold as a whole fish or as salmon fillets. "Weight band," in turn, refers to the weight ranges at which the salmon is sold in the United States and Japan.

We have examined the evidence on the record to determine preliminarily whether there is a *bona fide* distinction between super-premium and premium merchandise. We have found that the evidence supports that such a distinction was drawn during the [review period] by the [Association], as well as by Japanese customers. This evidence includes: (a) the Association's grading criteria, (b) specifications issued by Japanese customers for salmon with a color rating higher than that required by the premium standard, and (c) labels used for packages of super-premium salmon that specifically refer to the "super-premium" grade.

In its Preliminary Results, Commerce again noted that "[c]ertain respondents contend that, in the Japanese market, there is a distinction between premium and super-premium salmon. While we have accepted this claim for the preliminary determination, we intend to examine this issue thoroughly at verification." *Preliminary Results*, 63 Fed.Reg. at 2,666 n. 3.

In other words, for purposes of the Preliminary Results, Commerce compared the prices charged by Mares Australes for premium salmon in the United States only to the prices charged for premium salmon in Japan. The exclusion from the price comparison of the higher prices charged for super-premium salmon in Japan of course affected Commerce's preliminary calculation of Mares Australes' dumping margin for the review period. In its Preliminary Results, Commerce assigned to Mares Australes a 1.21% weighted average dumping margin for its sales of premium-grade salmon in the United States during the review period. Preliminary Results, 63 Fed.Reg. at 2,671. Because this was less than 2%, Commerce considered it de minimis (19 U.S.C. § 1673b(b)(3)), and the Preliminary Results effectively exempted

Mares Australes from the assessment of any dumping duties.

In its Final Results, however, Commerce changed course and determined that super-premium salmon was "identical in physical characteristics," 19 U.S.C. § 1677(16)(A), to premium-grade salmon. It stated:

> After conducting verification and carefully considering the evidence on the record, we have concluded that any differences between premium and super-premium salmon are so minor as to not warrant separate classification in an antidumping analysis.

Final Results, 63 Fed.Reg. at 31,414.

In reaching this conclusion, Commerce recognized that Mares Australes "reported higher prices for sales of super-premium grade salmon" to Japan. *Id.* And Commerce recognized that the Association's grading standards "specified distinct 'premium' and 'super-premium' grades." *Id.* But Commerce noted that "the record also contains evidence that the distinctions between the two grades were, in practice, nominal." *Id.* With regard to the alleged distinction in color between the two grades of salmon, for example, Commerce observed that "respondents routinely export to the United States salmon that has the same meat color as salmon exported to Japan," and accordingly concluded that respondents "do not consider the criterion (color) that was initially claimed to be of paramount significance" in distinguishing between super-premium and premium salmon. *Id.*

Commerce also discounted minor physical differences between salmon of the two grades, such as "small scale loss or light lacerations," stating that "these minor differences ... do not establish a different grade of salmon for purposes of our analysis." *Id.* And Commerce observed that

Mares Australes' sales of premium salmon to Japan "covered only a few months during the [period of investigation] and involved relatively small quantities." *Id.* at 31,415. Thus, Commerce concluded that the sales of premium salmon were "an insufficient basis on which to find systematic price differences between the two labels, much less to employ a matching methodology based on such differences." *Id.*

As support for its conclusion that super-premium was not a commercially recognized separate grade, Commerce also pointed to commercial practice in countries (other than Chile) exporting to Japan, whose salmon industries did "not recognize any grade higher than 'superior.'" Final Results, 63 Fed.Reg. at 31,414. Commerce stated in pertinent part that:

> While the Chilean respondents that sell to both the United States and Japan may sort their harvest based on the premise that Japanese customers are more likely to take notice of a light defect than U.S. customers, such differences are not recognized by the salmon producers of any other nation that exports to Japan. The Norwegian, Scottish, Canadian, and U.S. farmed salmon industries do not recognize any grade higher than "superior." The "superior" grade is consistent with the premium grade and permits minor defects.... Because the grading standards of "superior" salmon recognized by the world's largest salmon farming countries provide for a range of quality ... we note that, by definition, there will be some merchandise within this grade with no imperfections ... Nonetheless, all salmon in this range are graded equally (*i.e.,* as "superior"/"premium"), and are comparable products in the market place.

*Id.* at 31,414–15. Commerce thus determined that "salmon reported as super-pre-

mium are in fact of premium grade," and accordingly compared the respondents' sales of both super-premium and premium salmon to Japan to corresponding sales of premium salmon only in the United States. *Id.* at 31,415.

The practical consequences of Commerce's decision to classify the two grades of salmon as "identical in physical characteristics," 19 U.S.C. § 1677(16)(A), was to increase Mares Australes' dumping margin from the de minimis level established in the Preliminary Results (1.21%) to a final dumping margin of 2.23%. *Compare* Preliminary Results, 63 Fed.Reg. at 2,671 *with* Final Results, 63 Fed.Reg. at 31,437.

On review, the Court of International Trade upheld Commerce's determination, reasoning first that the phrase " 'identical in physical characteristics,' as used in the [antidumping] statute, is an ambiguous term" because, in pertinent part, "the statute does not direct Commerce how to decide whether merchandise is identical in physical characteristics." *Pesquera Mares Australes,* 2000 WL 766520, at *3. And the court next determined that Commerce's decision to treat the two grades at issue as a single grade "was a reasonable interpretation of the statute" that was entitled to deference under *Chevron. Id.* at *5.

In reaching this result, the court also rejected Mares Australes' argument that Commerce improperly considered evidence of commercial practice in making its final determination. The court concluded that:

> The statute on its face does not prohibit Commerce's evaluation of industry standards when determining whether particular products are identical.... Moreover, the Court cannot find, and Pesquera does not supply, any authority which restricts evidence to the individual producer's standards.... Commerce's consideration of industry standards is reasonable be-

cause industry standards indicate what most salmon producers consider to be identical merchandise. *Id.* at *7. The court accordingly sustained "the portions of the [Final Results] pertaining to Commerce's decision to treat super-premium and premium grade salmon as identical merchandise." *Id.* at *7. This timely appeal followed.

## DISCUSSION

### I

■ This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5). "When reviewing anti-dumping determinations made by Commerce, this court applies anew the standard of review applied by the Court of International Trade in its review of the administrative record." *Micron Tech., Inc. v. United States,* 243 F.3d 1301, 1307–08 (Fed.Cir.2001) (quoting *F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1031 (Fed.Cir.2000)). In doing so, we uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

■ We first turn our attention to the standard of review to be afforded to the antidumping determination at issue. The question is whether we should review the questions of statutory interpretation involved here under the traditional two-step *Chevron* analysis (*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)), or under the less deferential regime set forth in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).[5] *See United States v. Mead Corp.,* 533 U.S. 218, ——, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001). We conclude that *Chevron* deference is afforded to Commerce's statutory interpretations as to the appropriate methodology, and therefore we do not reach the question whether Commerce's statutory interpretations could withstand review under the less deferential *Skidmore* regime.

■ Where Commerce has adopted a regulation by notice-and-comment rulemaking pursuant to the Administrative Procedure Act (5 U.S.C. § 553), the *Chevron* standard, of course, applies. *See Mead,* 533 U.S. at ——, 121 S.Ct. at 2172; *United States v. Haggar Apparel Co.,* 526 U.S. 380, 390, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999).

In many past cases, however, we have afforded *Chevron* deference to Commerce's antidumping determinations even when (as here) there is no applicable regulation. In *Thai Pineapple Public Co., Ltd. v. United States,* 187 F.3d 1362 (Fed.Cir. 1999), *cert. denied,* 529 U.S. 1097, 120 S.Ct. 1830, 146 L.Ed.2d 775 (2000), for example, we held that Commerce's reliance on certain cost allocation methodologies provided by Thai fruit producers to calculate those producers' dumping margins was entitled to *Chevron* deference. In reaching that conclusion, we reasoned in pertinent part:

> Antidumping investigations are complex and complicated matters in which Commerce has particular expertise and thus Commerce's determinations are entitled to deference. *See Chevron,* 467 U.S. 837, 844, 104 S.Ct. 2778 [1984]. We conclude, therefore, that Commerce's re-

---

**5.** Under the standard of review established in *Skidmore,* "[t]he weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161.

liance on the books and records of [the Thai fruit producers] was reasonable. *Id.* at 1367. Other decisions of this court before *Mead* similarly afforded *Chevron* deference to Commerce's determinations even when no formal regulation was at issue. *See, e.g., Micron Tech., Inc. v. United States,* 243 F.3d 1301, 1314 (Fed. Cir.2001) (holding that Commerce's "interpretation of [19 U.S.C. § 1677a(d)(1)(D)] in the administrative decision under review is reasonable, and therefore entitled to deference under *Chevron* "); *Torrington Co. v. United States,* 82 F.3d 1039, 1046 (Fed.Cir. 1996) (holding that "we must defer to Commerce's method of applying the antidumping laws to exempt the merchandise at issue here from antidumping duties if that method is based on a reasonable construction of the pertinent statutes" (citing *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778)); *Koyo Seiko, Co., Ltd. v. United States,* 66 F.3d 1204, 1209 (Fed.Cir.1995) (affording *Chevron* deference to Commerce's model-matching methodology, because Congress' "delegation of authority empowers Commerce to choose in the manner in which [the pertinent merchandise] shall be selected. *Chevron* applies in such a situation.").

The Supreme Court's recent decision in *Mead* does not change our obligation to afford *Chevron* deference to Commerce's interpretations of ambiguous statutory terms articulated in the course of Commerce's antidumping determinations.

■ We understand *Mead* to clearly recognize that *Chevron* deference is not limited to regulations adopted after notice-and-comment rulemaking. The line that *Mead* draws is not defined with great clarity. However, we conclude that *Chevron* deference is due at least to those statutory interpretations that are articulated in any "relatively formal administrative procedure," *Mead,* 533 U.S. at ——, 121 S.Ct. at 2172, where Congress has provided for agency resolution of rights, subject to deferential judicial review (whether such judicial review involves direct review of the agency, and whether it is confined to review on the administrative record) and those interpretations are embodied in rulings that are given precedential effect by the agency. That much appears from the *Mead* decision itself.

■ In *Mead,* the Supreme Court reaffirmed the well-established principle that:

[An] administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.

*Id.* at 2171. *Chevron* deference is due if "the agency's generally conferred authority and other statutory circumstances [shows] that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law...." *Id.* at 2172. The Court also noted that "[d]elegation of such authority may be shown in a variety of ways, *as by an agency's power to engage in adjudication* or notice and comment rulemaking, or by some other indication of a comparable congressional intent." *Id.* at 2171 (emphasis added). *Mead* found "a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Id.* at 2172. The precedential nature of agency determinations, while not sufficient to "add up to *Chevron* entitlement," *Mead,* 533 U.S. at ——, 121 S.Ct.

at 2174, militates in favor of the application of *Chevron.*

And *Mead* makes clear that the "agency's power to engage in adjudication," *id.* at 2171, may be exercised in an administrative procedure that is only "relatively formal." *Id.* at 2172. As an example of such an administrative procedure, *Mead* cites to *NationsBank of North Carolina, N.A. v. Variable Annuity Life Insurance Co.,* 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995). *Mead,* 533 U.S. at ——, 121 S.Ct. at 2173. In that case, a single bank sought approval from the Comptroller of the Currency to act as an agent in the sale of annuities. The Comptroller granted the bank's application, concluding that the National Bank Act permitted banks to broker annuities. *NationsBank,* 513 U.S. at 255, 115 S.Ct. 810. The Supreme Court in *NationsBank* afforded *Chevron* deference to the Comptroller's statutory interpretation, noting that "[a]s the administrator charged with supervision of the National Bank Act, the Comptroller bears primary responsibility for surveillance of the business of banking." *Id.* at 256 115 S.Ct. 810 (internal quotations and citations omitted).

In contrast, *Mead* concludes that administrative determinations such as Customs rulings do not draw *Chevron* deference because Congress has not provided for deferential judicial review of those determinations. In *Mead,* for example, the Court noted in pertinent part that Congress had explicitly provided for "independent review of Customs classifications by the [Court of International Trade]." 533 U.S. at ——, 121 S.Ct. at 2174. This statutory prescription of independent judi-

cial review of those administrative determinations led the Court to conclude that "[i]t is hard to imagine a congressional understanding more at odds with the *Chevron* regime." *Id.* In addition, the Customs classification rulings had been expressly denied precedential effect by Customs. *See Mead,* 533 U.S. at ——, 121 S.Ct. at 2169 (citing 19 C.F.R. § 177.9).

The antidumping proceedings conducted by Commerce may of course be fairly characterized as "relatively formal administrative procedure[s]" that adjudicate parties' rights. *Mead,* 533 U.S. at ——, 121 S.Ct. at 2172. Congress, for example, explicitly delegated authority to Commerce to review and determine "the amount of any antidumping duty" and to "publish in the Federal Register the results of such a review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed." 19 U.S.C. § 1675(a)(1)(B)-(C).[6] Congress has also provided that the Court of International Trade should review Commerce's antidumping determinations for "substantial evidence," based on the administrative record. 19 U.S.C. §§ 1516a(b)(1)(B)(i), (b)(2)(A). Commerce routinely considers the legal interpretations announced in its prior antidumping and countervailing duty determinations to be precedential. *See, e.g., Porcelain–on–Steel Cooking Ware From Mexico: Final Results of Antidumping Duty Administrative Review,* 58 Fed.Reg. 43,327, 43,332 (Aug. 16, 1993) (relying on prior antidumping determinations that set forth Commerce's "long standing policy" on treatment of certain interest deductions by foreign exporters). So too does the Court of International

---

**6.** In *Merck & Co., Inc. v. Kessler,* 80 F.3d 1543, 1549–50 (Fed.Cir.1996), *cert. denied,* 519 U.S. 1101, 117 S.Ct. 788, 136 L.Ed.2d 730 (1997), we held that an agency without substantive rulemaking authority cannot claim *Chevron* deference for statutory interpretations rendered in the course of administrative proceedings. Commerce, of course, possesses substantive rulemaking authority.

Trade[7] and this court. *See British Steel PLC v. United States,* 127 F.3d 1471, 1476 (Fed.Cir.1997) (sustaining Commerce's "abandonment of [its] methodologies" in countervailing duty investigation only because the agency "demonstrated that it was necessary to abandon [those] particular" methodologies). Commerce's decisions are, moreover, self-executing (that is, binding without the need for judicial enforcement), another indication of *Chevron* entitlement. In short, Commerce's antidumping determinations are "adjudication[s] that produce ... rulings for which deference [under *Chevron*] is claimed." *Mead,* 533 U.S. at ——, 121 S.Ct. at 2171.

Indeed, since the *Mead* decision, we have explicitly recognized that *Chevron* deference is due to such administrative rulings, even when there is no formal regulation at issue. In *American Silicon Technologies v. United States,* 261 F.3d 1371, 1378 (Fed.Cir.2001), for example, we deferred to Commerce's reliance on certain depreciation expenses provided by a foreign importer to calculate that importer's dumping margin. In reaching that conclusion, we reasoned in pertinent part that:

> Neither the [antidumping] statute nor the [Statement of Administrative Action] instructs Commerce as to the methodology it must use to establish depreciation expenses in [constructed value] calculation. Consequently, our review focuses on whether Commerce was *reasonable* in accepting the depreciation methodology [at issue].

*Id.* at 1377–78 (citing *Mead,* 533 U.S. at ——, 121 S.Ct. at 2172, and *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778) (emphasis in original).

In sum, we conclude, in accordance with our recent decision in *American Silicon Technologies,* that statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron.* We now turn to the merits of this appeal.

## II

■ This case requires us to interpret the phrase "identical in physical characteristics" as that phrase appears in the definition of "foreign like product" in 19 U.S.C. § 1677(16)(A). In order to ascertain the "established meaning," *NSK Ltd. v. United States,* 115 F.3d 965, 974 (Fed.Cir.1997), of a term such as the word "identical," it is appropriate to consult dictionaries. *See Int'l Bus. Machs. Corp. v. United States,* 201 F.3d 1367, 1372 (Fed.Cir.2000); *Best Power Tech. Sales Corp. v. Austin,* 984 F.2d 1172, 1177 (Fed.Cir.1993).

There are a variety of dictionary definitions of "identical." Some require exact identity. *See, e.g., American Heritage Dictionary* 896 (3d ed.1996) (defining "identical" as "being the same" and "exactly equal and alike"); 7 *Oxford English Dictionary* 618 (2d ed.1989) (defining "identical" as "the same, the very same" and "agreeing entirely in material constitution, properties, qualities"); *Random House College Dictionary* 659 (rev. ed.1975) (defining "identical" as "exactly the same"). Others allow "minor differences" so long as the items are "essentially the same." *See, e.g., The American Heritage Dictionary* 639 (2d ed., 1991) (defining "identical" in pertinent part as "[h]aving such a near similarity or resemblance as to be essentially equal or interchangeable"); *Webster's Third New International Dictionary* 1122–23 (1963) (defining "iden-

---

7. *See Cinsa, S.A. de C.V. v. United States,* 966 F.Supp. 1230, 1238 (Ct. Int'l Trade 1997) ("Commerce can reach different determinations in separate administrative reviews but it must employ the same methodology or give reason for changing its practice.").

tical" in pertinent part as "having such close resemblance and such minor differences as to be essentially the same"); *Funk & Wagnalls Standard College Dictionary* 665 (4th ed.1973) (noting that "identical" and "same" may be used loosely, however, to mean closely alike or equivalent).

We find nothing in the statute to suggest that Congress intended to depart from the ordinary definition of the term "identical." But that leaves the question of which of the two common usages was intended by Congress: exactly the same or the same with minor differences?

■ We conclude that Congress intended the latter usage. As the Court of International Trade observed in the decision on appeal, Mares Australes' interpretation of the term "identical" to mean exactly the same "would frustrate the purpose of the [antidumping] statute." *Pesquera Mares Australes*, 2000 WL 766520, at *3. As appellee Coalition for Fair Atlantic Salmon Trade points out, Congress could hardly have intended to require Commerce in each and every instance to compare *all* the physical characteristics of the goods. It might not be possible, for example, with certain types of merchandise to "account for every conceivable physical characteristic" of that merchandise. *Certain Cold Rolled Carbon Steel Flat Products From Germany; Final Results of Antidumping Duty Administrative Review*, 60 Fed.Reg. 65,264, 65,271 (Dec. 19, 1995) ("Carbon Steel Final Results"). Indeed, in the antidumping investigation at issue, Commerce (with agreement of all parties) used three matching criteria based on the physical characteristics of the salmon: "form, grade, and weight band." Preliminary Results, 63 Fed.Reg. at 2,666. The "weight band" criterion, in turn, treated salmon of slightly differing weights (or salmon that could be characterized as "nearly alike") as

"identical" for purposes of the antidumping determination.

In support of its argument that Congress intended the word "identical" to mean exactly the same (rather than the same with minor differences), appellant notes that 19 U.S.C. § 1677b(a)(6)(C) authorizes Commerce to adjust normal value (*i.e.*, to make a "difmer adjustment") when it "is established to the satisfaction" of that agency that any difference between the normal value and the United States price is "wholly or partly due" to the fact that non-identical merchandise (*i.e.*, merchandise that falls under the definitions of "foreign like product" set forth in 19 U.S.C. § 1677(16)(B)-(C)), is used to calculate normal value. Appellant reasons from the existence of this statutorily-prescribed "difmer adjustment" that Congress intended the word "identical" used in 19 U.S.C. § 1677(16)(A) to mean "exactly the same." We do not agree. The language of 19 U.S.C. § 1677b(a)(6)(C)(ii) tells us nothing about what definition of "identical" Congress intended Commerce to follow.

Despite our conclusion that Congress intended to allow identical merchandise to have minor differences, the phrase "identical in physical characteristics," 19 U.S.C. § 1677(16)(A), remains ambiguous, and, as we have discussed above, under *Chevron* Commerce has discretion to define the term. *See SKF USA Inc.*, 263 F.3d at 1381 (noting that Commerce has "considerable discretion in defining 'foreign like product.'"); *American Silicon Technologies*, 261 F.3d at 1378.

This conclusion also finds support in our earlier (pre-URAA) decisions. In *Koyo Seiko Co. v. United States*, 66 F.3d 1204 (Fed.Cir.1995), for example, we held that *Chevron* deference was owed to the model-matching methodology used by Commerce to determine the appropriate "such or sim-

ilar merchandise"[8] to be compared to the subject merchandise exported to the United States. We concluded that:

> Congress has implicitly delegated authority to Commerce to determine and apply a model-match methodology necessary to yield "such or similar" merchandise under the [pre-URAA antidumping] statute. This Congressional delegation of authority empowers Commerce to choose the manner in which "such or similar" merchandise shall be selected. *Chevron* applies in such a situation.

*Id.* at 1209. In other words, we concluded in *Koyo Seiko* that Commerce has the discretion to fashion the methodology used in turn to determine the "foreign like product." So here Commerce has considerable discretion in defining "identical in physical characteristics." 19 U.S.C. § 1677(16)(A).

Commerce has concluded that merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant. We conclude that this standard adopted by Commerce constitutes "a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.

But that is not the end of the inquiry. We must also determine whether Commerce's commercial practice determination here is supported by substantial evidence and whether Commerce has provided an adequate explanation for its determination. *See Motor Vehicle Mfrs. Assoc. v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ Mares Australes points out (and Commerce does not dispute) that a "super-premium" grade of Chilean salmon is recognized by Japanese customers. And it notes that Commerce also found that such salmon commanded a higher price in Japan, as it recognized in its Final Results that the Association had provided evidence that "Mares Australes, the only respondent to sell both super-premium and premium grade salmon to Japan, reported higher prices for sales of super-premium grade salmon." Final Results, 63 Fed. Reg. at 31,414. Mares Australes urges that Commerce accordingly should have not have treated the two salmon grades at issue as a single grade.

Commerce disagrees. It points out that (as it found in the Final Results) Mares Australes' sales of premium salmon to Japan "covered only a few months of the [period of investigation] and involved relatively small quantities...." *Id.* at 31,415. In view of the small number of sales of premium salmon to Japan during the pertinent period, Commerce looked to commercial practice of "the world's largest salmon farming countries" whose salmon industries also exported to Japan. *Id.* The salmon industries of those countries (namely, Norway, Scotland (*i.e.*, the United Kingdom), Canada and the United States) did "not recognize any grade higher than 'superior.'" *Id.* at 31,414. And Commerce determined that "[t]he 'superior' grade is consistent with premium grade and permits minor defects." *Id.* Thus, Commerce determined that super-premium was not a commercially recognized separate grade of salmon for purposes of the Japanese salmon import market.

We conclude that this finding is supported by substantial evidence, and that it has been adequately explained. We agree that the existence of sales of pre-

---

**8.** The term "such or similar merchandise" was used in the statutory provision at issue, 19 U.S.C. § 1677(16), prior to 1995 and was replaced (following the enactment of the URAA) by the term "foreign like product."

mium salmon "which covered only a few months ... and [which] involved relatively small quantities," *id.*, does not compel Commerce to recognize those sales as establishing a commercial practice of distinguishing between those two grades. Under these circumstances Commerce properly looked to the overall commercial salmon market for the country selected, here, Japan. Finding that other exporters of salmon to Japan do not sell super-premium salmon, Commerce properly found the differences between super-premium and premium salmon do "not warrant separate classification in an antidumping analysis." Final Results, 63 Fed.Reg. at 31,414.

In sum, Commerce has adequately explained why it looked to commercial practice of other countries whose salmon industries also exported to Japan in the circumstances of this case. Indeed, if Commerce were to limit itself to consideration of the small volume of "premium"

sales of the particular exporter, it would risk market manipulation for antidumping purposes. While Commerce specifically found such manipulation absent here, *id.* at 31,414,[9] the risk of such manipulation strongly supports Commerce's overall approach.

## CONCLUSION

For the foregoing reasons, the decision of the Court of International Trade is affirmed.

*AFFIRMED.*

## COSTS

No costs.

---

9. The Final Results states in pertinent part that Commerce was "not persuaded by the petitioners' assertion that the Association's adoption of the super-premium grade ... was designed primarily to avoid comparisons, in the event of an antidumping case, of low-priced sales of premium-grade salmon to the United States to high-priced sales of the same merchandise to Japan." Final Results, 63 Fed.Reg. at 31,414.